## LIZZIE CHANCEY v. THE STATE OF TEXAS.

### No. 8153.

1. **Sale of Land to Actual Settlers.** — The statute (Laws 1883, p. 87, sec. 8) prescribes that agricultural lands should be sold only to actual settlers; and that settlement within six months after purchase either by the original purchaser or some person to whom he might sell was necessary to the acquisition of title from the State, is not an open question.

2. **Purchaser can Sell after Making First Payment.**—That the law did not make actual settlement by the purchaser necessary to his right to sell is evidenced by the twelfth section of the act (Laws 1883, p. 87), which declares, "that in case any purchaser desires to sell the land purchased by him he may do so after his first payment, and in case of such sale his vendee shall file in the office of the custodian of the original obligation of his vendor a properly authenticated transfer, signed by said vendor and vendee, duly acknowledged and recorded in the proper county, and said vendee shall thereby assume the obligation and be liable to the penalties imposed upon the original purchaser, and said original purchaser shall thereby be relieved from any further liability upon his obligation."

3. **Same—Power of Land Board.**—When the Legislature conferred the right to sell based only on the condition that the first payment should be made, the Land Board had no power to attach the further condition of actual settlement and occupancy, unless the Legislature had conferred upon that body such power.

4. **Land Board—Laws of 1883, page 87.**—It certainly was not the intention of the act in question to confer upon the Land Board any power to change the law by adding terms or conditions to it upon which persons would be permitted to buy or sell. The classification, the time and manner of selling the lands, was committed to the Board.

5. **Same.**—The law prescribed the conditions on which persons might purchase lands, and determined the rights of a person who had made a valid contract to purchase under it, and there is nothing in it evidencing an intention on the part of the Legislature to give to the Land Board any power to annul or in any manner limit the effect of the law in these respects.

6. **Legislative Power.**—Laws can be made in this State only by the Legislature, and it has no power to delegate to any board or other department of the government the power to annul laws enacted by it. The public school lands can be sold only "under such regulations and on such terms as may be prescribed by law." Const., art. 7, sec. 4.

7. **Actual Settlement.**—Actual settlement of the land was what the Legislature desired, and whether this was made by the original purchaser or some one holding under him was not important to the State, provided the settlement was made within the time prescribed.

8. **Same — Case Limited.** — King v. James, 78 Texas, 285, limited. The dicta that until the purchaser had made actual settlement was not upon facts involved.

9. **Case Adhered to.** — Taylor v. Burke, 66 Texas, 647, adhered to, that actual settlement was a condition upon which the land was sold, and that when the settlement was made upon the land within six months it is not necessary that the vendee keep up the possession upon his making the stipulated payments of principal and interest as they become due.

10. **Case in Judgment.**—Shriver regularly contracted for the land in controversy. After making the first payment he sold to Hale, who made actual settlement thereon and resided upon it for several months, when he sold to appellant, who kept up the

payments as they became due. Upon such facts she was entitled to the land; a charge otherwise was reversible error.

11. **Mistake as to Lines.**—It seems that a settlement made in good faith upon the land as surveyed at the time would not be rendered invalid upon a subsequent survey changing the lines.

APPEAL from Hardeman.    Tried below before Hon. G. A. BROWN. No statement is necessary.

*Duncan G. Smith,* for appellant.—1.   The special exceptions of defendant Lizzie Chancey to the petition of plaintiff should have been sustained:   (1) Because Shriver had a right to sell at any time after he had made his first payment.    (2) If Shriver sold to Hale before actual settlement, Hale had the right to make the purchase and settlement within the six months.    (3) If either Shriver or Hale had made actual settlement in good faith within six months, defendant Chancey, by her purchase from Hale, took a good title, subject to the payment of the balance of the purchase money due the State, free from any conditions of actual settlement or residence on her part.    (4) Every condition of the sale to Shriver prescribed by the rules and regulations of the Land Board and embraced in Shriver's contract of purchase, except the conditions of actual settlement within six months and payment of the purchase money, are extraordinary and onerous conditions upon the purchaser, and the allegation by plaintiff of these conditions should have been stricken out upon the special exceptions of defendant Chancey.    The State v. Opperman, 74 Texas, 141.

2.   This case involved a single inquiry of fact—a mere question as to whether the land in controversy was actually settled in good faith by either Shriver, or Hale, his vendee, or by both, within six months from the date of Shriver's purchase from the State Land Board.    The instruction complained of was uncalled for by the facts of the case, and could have had no tendency to aid the jury in coming to a right conclusion, but rather the contrary.    Under this charge the jury could do nothing but find for the plaintiff.    Acts 1883, chap. 88, sec. 6, 8, 12; Taylor v. Burke, 66 Texas, 643; The State v. Opperman, 74 Texas, 141; O'Neal v. Manning, 48 Texas, 406; Hill v. Still, 19 Texas, 83.

*C. A. Culberson,* Attorney-General; *R. L. Henry,* Assistant; and *A. G. Walker,* for the State.—1.  The Land Board was constituted the agent of the State for the sale of the public lands, with power to make rules and regulations, and by virtue of such authority entered into the contract with Shriver.   He accepted its terms voluntarily, and it became a matter of record, carrying notice thereof to appellant.   No other officer or agent was authorized to sell the land.   The extent of this authority and the character of the contract is a matter of law of which

Shriver and appellant must take notice. If the contract is within the authority granted to the Board by the State, Shriver and those claiming under him must perform it or return the land. If it is unauthorized, the State is not bound by it, and is entitled to have it cancelled and recover the land. The contract must stand or fall in its entirety. Nothing can be taken from it by judicial interpretation, as contended for by appellant, because that would enforce a contract never entered into by the State.

. 2. There was no error in refusing to give the special charge asked by appellant [see opinion], because it assumed that Shriver, the original purchaser, could sell the land without actually settling upon it as his home. And the law demands more than mere preparation to settle, as is shown in this case, considered in the most favorable light for appellant. The purchaser must become an "actual settler." As a matter of fact, the dugout alleged to have been begun by Shriver was not on this section. Baker v. Millman, 77 Texas, 46; Luckie v. Watt, 77 Texas, 262; King v. Jones, 78 Texas, 288.

STAYTON, CHIEF JUSTICE.—The land in controversy was originally sold by the Land Board to Owen Shriver, in November, 1886, and the State of Texas brought this action to recover the land on account of an alleged failure on the part of Shriver or persons claiming through him to comply with the terms of his purchase.

Shriver's application for the land was as follows:

"*To Secretary State Land Board:*

"I hereby apply to purchase under regulations of the State Land Board, adopted May 2, 1885, the following land, situated in Hardeman County, viz., Section 280, block H, Waco & Northwestern Railway Company certificate 1–140, 640 acres. The land applied for does not embrace or front on any water, and the character of the soil, grass, and timber is as follows: agricultural land, mesquite grass, and brush. For the purpose of securing said land and of complying with the law and regulations of the Land Board disposing of same, I hereby make and subscribe to the following oath, to-wit: I, Owen Shriver, do solemnly swear, that I desire the land for which I have this day made application for a homestead for myself; that I will within ninety days become an actual settler and resident upon the said land, and will continue to reside upon and improve the same for the period of three consecutive years; that during said time I will not sell the same to any other person except such as will continue to reside upon and improve same as a homestead; that I am not acquiring same for any other person, corporation, etc.; it being understood and agreed, that no transfer is allowed until I have actually settled upon the same and improved it as my home; that I am 21 years of age; that I am to pay, etc. It is

, further understood, that any violation of any of the provisions of the law, or any violations of the rules and regulations of the State Land Board prescribing the manner of purchasing said land, or a failure to settle upon or improve the land, or any failure to make any of the payments required by law or said resolutions, shall work a forfeiture of all money paid, etc.; it being also understood and agreed, that the object of the sale to me is for the purpose of securing a bona fide actual settler on the land," etc.

Shriver made the first payment and the land was awarded to him, and in January, 1887, he commenced improving what he supposed to be the land, for a home, but before he erected a house or moved upon the land he sold it to J. C. Hale, to whom he made a conveyance dated January 18, 1887. The conveyance from Shriver to Hale was signed by both parties, and therein Hale bound himself to comply with all the obligations assumed by Shriver in his purchase.

Hale completed the residence commenced by Shriver, and with his family moved into it soon after his purchase, and there remained until about September 22, 1887, when he conveyed to Lizzie Chancey, who has never lived upon the land, but has improved it to some extent, and has during the most of her time since her purchase had employes or tenants upon it. All the interest due on the notes for purchase money was paid, and the evidence tends to show that Shriver and Hale in good faith intended when they purchased to make the land the home of themselves and families; but it does not appear that Mrs. Chancey ever intended to live on the land.

There seems to be some question whether the house when first erected was on the land, some of the witnesses testifying that it was not and others stating that it was, according to the original survey and corners; but that it was not under surveys made in 1888, by which the lines seem to have been moved north and west.

The court gave the following charge: "Gentlemen of the jury, this is a suit on a breach of contract and purchase of O. Shriver with the State Land Board of Texas to purchase State school land, section 280, block H, Waco & Northwestern Railway Company. The court charges you, that if you find that said Shriver did as alleged by plaintiff enter into said contract, and agree and obligate himself that he would actually settle upon and improve said land as a home, and also agreed and obligated himself that he would not sell said section of land to any one before he made such actual settlement, and not then except to one who would so settle upon and occupy the same for the space of three years, then you should look to the evidence to ascertain whether said O. Shriver did actually settle upon and improve said land as a home within six months, or whether he sold same before he actually settled upon same as a home; and if from the evidence you find that said Owen

Shriver did not settle upon and occupy said land or sold the same before he actually settled thereon, then this would be a breach of the contract, and you should find a verdict for plaintiff."

· The only other charge given was as follows: "If you should find that Lizzie Chancey purchased the land in controversy from J. C. Hale, on or about the 22d day of September, 1887, who purchased from Shriver, and that she never went on the land and occupied the same as a home, you will find a verdict for plaintiff."

The court refused the following charge requested by defendant: "If the jury believe from the evidence that Owen Shriver purchased the land in controversy from the State Land Board in November, 1886, and made his first payment to the State and executed his obligation for the balance of the purchase money, and that he purchased said land in good faith, intending to actually settle thereon within ninety days from the date of the award to him by the State Land Board, or within six months from the date of said award, and within either of the times stated he went upon the land and began to improve same for a homestead for himself and family, and that during said improvement, and after he had made his first payment to the State on said land, he sold same to J. C. Hale, and that J. C. Hale bought said land for a home for himself and family, in good faith, intending to become an actual settler thereon within ninety days or six months from the date of the award to Shriver, and continued the improvements begun by said Shriver, and did, within ninety days or six months from the date of the award to Shriver, actually settle upon said land as a home for himself and family, and with his family, and that said J. C. Hale, after his settlement thereon in good faith, sold said land to Defendant Lizzie Chancey, and that said Lizzie Chancey has since her purchase of said land paid all interest to the State on the obligation of said Shriver, regularly, you will find for the defendant, Lizzie Chancey."

The charge given made the right of appellant to depend upon the actual settlement and occupancy of the land by Shriver before he sold, and upon the further fact of its occupancy by appellant as a home. This was evidently based on a rule of the Land Board which required an applicant to make oath that he desired the land for a homestead for himself, and "that I will within six months become an actual settler and resident upon the said land, and will continue to reside upon and improve the same for the period of three consecutive years; that during the said time I will not sell or rent the same to any other person, except to such person as will continue to reside upon and improve the same as a homestead."

The statute provided, that agricultural lands should be sold only to actual settlers; and that settlement after purchase either by the original purchaser or some person to whom he might sell was necessary to the acquisition of title, is not an open question.

The statute declares, that "no sale of agricultural land shall be perfected until the proposed purchaser files an affidavit that he intends that the land shall be actually settled within six months; and in case of failure to settle the same within that time, the proposed purchaser shall forfeit the money paid on the land." Gen. Laws 1883, p. 87, sec. 8.

This is the only part of the statute which prescribes the oath to be taken by the person desiring to purchase, and the only part which declares within what time settlement must be made, and what will be the effect of failure to settle within the time prescribed, which it ought to be conceded would not only be a forfeiture of the money paid but also a forfeiture of right to the land under the purchase.

The next section of the statute required the land to be paid for in thirty annual payments, but "provided, that upon proof of actual occupancy, use, and improvement for three consecutive years, the purchaser shall be permitted to pay all the purchase money remaining unpaid."

The purpose of this, however, was not to require the purchaser to occupy, use, and improve the land for three consecutive years or for any other period before he would acquire the right to sell it, but it was intended thereby to secure to the purchaser the right under such conditions to pay for the land at an earlier period than otherwise he would have the right to do. That the law did not make actual settlement by the purchaser necessary to his right to sell is evidenced by the twelfth section of the act, which declares, that "In case any person desires to sell the land purchased by him, *he may do so after his first payment*, and in case of such sale his vendee shall file in the office of the custodian of the original obligation of his vendor a properly authenticated transfer, signed by said vendor and vendee, duly acknowledged and recorded in the proper county, and said vendee shall thereby assume the obligations and be liable to the penalties imposed upon the original purchaser, and said original purchaser shall thereby be relieved from any further liability upon his obligation."

The right to sell after first payment, which must be made simultaneously with or before purchase, would be a barren right if no person could lawfully purchase.

When the Legislature conferred the right to sell land only on the condition that the first payment had been made, the Land Board had no power to attach the further condition of actual settlement and occupancy, unless the Legislature had conferred upon that body such a power.

That actual settlement within six months from the purchase was made necessary by the law for the preservation of the right acquired by the application, affidavit required by law, and making of the first payment, can not be denied. The purpose of the affidavit was to give

to the State an assurance that the applicant intended to become an actual settler on the land; and when that was made as the law required, accompanied with a proper application and with money to make the first payment, then the award of the Land Board, the other preliminary steps required by the statute and resolutions of the Board lawfully passed having been taken, completed a contract, under which the purchaser had the right to sell before he had made actual settlement; his vendee being subject to obligation to settle within the time prescribed, unless the Land Board had power to change and did change the law in these respects.

That the Land Board did intend to make actual settlement a prerequisite to the right to sell it is claimed is to be inferred from the affidavit before quoted, which was required by its resolution, as was the further statement in the application, as follows: "It being understood and agreed that no transfer is allowed until I have actually settled upon the land and improved it as my home.   *   *   *   It is further understood, that any violation of any of the provisions of the law, or any violation of the rules and regulations of the State Land Board prescribing the manner of purchasing said land, or a failure to settle upon or improve the land,   *   *   *   shall work a forfeiture of all money paid, etc.   *   *   *   It being also understood and agreed, that the object of the sale to me is for the purpose of securing a bona fide actual settler on the land."'

If it be conceded that the resolution of the Land Board requiring such an application and affidavit evidences an intention of that body to change the law, then the inquiry arises whether the Legislature intended or had the power to confer upon it any such power.   In the nature of things, there are many matters of detail necessary to enable the Land Board to carry into effect the law; the law permitted agricultural lands to be sold only to actual settlers, while it permitted lands only suitable for pasturage to be sold to other persons; the quantity of land one person was permitted to buy was determined by the character of the land; a minimum price was fixed on lands without water on or bordering on them, while a different minimum was fixed on lands having permanent water, and still another was fixed on lands classed as timber lands; and it was impossible for the Legislature to make the classification of the many tracts to be put upon the market.   In view of this fact, the Legislature in the third section of the act providing for the sale of school lands empowered the Land Board, "under such regulations as they may prescribe," to classify these lands and to ascertain and make a record thereof many facts necessary to enable the Board "to ascertain the true value or class of such land."   It certainly was not intended by this Legislature to confer on the Land Board any power to change the law by adding terms or conditions to it upon which persons would be permitted to buy or sell.

The sixth section of the act determined where the land should be sold, but it left to the Land Board the power to determine who should represent the State in that locality, and to prescribe regulations whereby competition among purchasers would be secured.

The seventh section of the act prescribed the *manner* in which lands should be placed upon the market until the Land Board should prescribe some other *manner*.

Neither the power to name the agent to receive bids, to provide rules to secure competitive bidding, nor the power to prescribe the *manner* in which the lands should be put upon the market gave to the Land Board the power, through regulations or by contract, to withhold from a purchaser, who had complied with the law and the regu-lations the board was authorized to make, any right which the law conferred upon him or his vendee by virtue of a contract completed in compliance with it. The law prescribed the conditions on which persons might purchase land, and determined the right of a person who had made a valid contract to purchase under. it, and there is nothing in it evidencing an intention on the part of the Legislature to give to the Land Board any power to annul or in any manner limit the effect of the law in these respects.

Under the act, the Land Board attempted to fix a minimum rental on school lands higher than that fixed by the Legislature, and it was held that the board was not authorized thus practically to annul the statute. Smisson v. The State, 71 Texas, 222; Coleman v. Lord, 72 Texas, 288. The regulation of the board requiring settlement within ninety days was held inoperative, because a shorter term than the law prescribed. The State v. Opperman, 74 Texas, 141.

Laws can be made in this State only by the Legislature, and it has no power to delegate to any board or other department of the government the power to annul laws enacted by it.

The public school lands can be sold only "under such regulations, at such times, *and on such terms as may be prescribed by law.*" Const., art. 7, sec. 4.

The proposition announced in the charge given is, in effect, that the regulations of the Land Board are superior to the law in reference to matters over which the Legislature alone could act, and to our minds it is clearly erroneous, because the Legislature never attempted to confer on the board such power as would be involved, and could not have done so if it had desired.

The statute shows an intention on the part of the Legislature to restrict the sale of agricultural lands to persons who are in fact actual settlers and to such as intended so to become within six months, and to show the good faith of the latter class the affidavit of intention before quoted was required to be made. When that was made and the law in other respects complied with, the contract of sale was said to be

"perfected;" but the right to acquire title to the land still might be forfeited by failure to actually settle on it within six months; and if we looked only to the eighth section of the act, it might be held that it was contemplated that the original purchaser should make the actual settlement, although his oath is only, "that the land shall be actually settled within six months." Looking, however, to the twelfth section of the act, which permits the purchaser to sell after his first payment and to transfer all his obligations to his vendee, we can not doubt that it was the intention of the Legislature to permit a sale before actual settlement by the original purchaser, the obligation to make the actual settlement resting in such case on same vendee. Actual settlement of the land was what the Legislature desired, and whether this was made by the original purchaser or some one holding under him was not important to the State, provided the settlement was made within the time prescribed.

It is contended, however, that it was held in King v. Jones, 78 Texas, 285, that a purchaser had no power to sell until he had actually settled on the land, but the facts of the case raised no such question. King had the land awarded to him on January 25, 1885, under application expressing intention to become an actual settler; but while he made some improvements on the land, he had not settled upon it when more than one year afterward the Land Board declared his right forfeited, after citing him to show cause why this should not be done, and sold the land to James. That King had forfeited all right to the land was clear, and the opinion so holds, and declares that the sale to James was valid. It is true that there is an expression in the opinion that King's right to purchase was dependent upon his becoming an actual settler, and that until he so became he had no right to sell, but the last expression was not based on the facts of the case, for King was the plaintiff and asserting right as an original purchaser.

As held in Taylor v. Burke, 66 Texas, 647, actual settlement was a condition on which the land in controversy was sold, and it was necessary that the settlement should be made within six months, but if made by a vendee of the original purchaser it was as effective to place the right beyond forfeiture as if the original purchaser had made it.

The same case correctly holds, when the right is perfected within six months by actual settlement, that it is not necessary for a vendee to keep up the possession in order to be entitled to the land on paying the principal and interest as it falls due. If the Legislature had desired to have a continuous occupation of such lands by an original purchaser or his vendee as a home for any definite period of time further than that necessary to show good faith, the law would have made such a requirement, and in its absence the courts can not hold that it was necessary for appellant to reside upon the land after she purchased it,

her vendee having actually settled upon it within six months from the purchase.

We are of opinion that both of the charges given by the court were incorrect; and that the charge requested and refused was substantially correct.

There is some controversy whether the house erected was at first placed on the land in controversy, and we deem it proper to say, if the settlement was made on the land as originally surveyed, then no change in the lines made by any surveyor subsequently to the original grant could affect the right of the parties.

We are further of the opinion, that if the settlement was made in good faith, at a point near the line but on another survey, under the belief, well founded, that it was on the land purchased, then this ought not to defeat the right of the purchaser or one holding under him.

For the errors noticed the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Delivered May 6, 1892.