# IN THE SUPREME COURT OF TEXAS

════════════

No. 17-0385

════════════

RUBEN ALEMAN, M.D., PETITIONER,

v.

TEXAS MEDICAL BOARD, RESPONDENT

════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
════════════════════════════════════════════

JUSTICE BLACKLOCK, joined by JUSTICE BROWN, concurring.

I agree with the Court that a physician who signs a death certificate with a pen does not "commit[] unprofessional or dishonorable conduct that is likely to deceive or defraud the public." TEX. OCC. CODE § 164.052(a)(5). I write separately to explain my reasons for reaching that conclusion, which differ from the Court's.

Section 164.051(a)(1) of the Occupations Code authorizes the Medical Board to discipline a person who "commits an act prohibited under Section 164.052." Section 164.052(a)(5), in turn, prohibits "commit[ting] unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053." Finally, section 164.053(a)(1) provides: "For purposes of Section 164.052(a)(5), unprofessional or dishonorable conduct likely to deceive or defraud the public includes conduct in which a physician: (1) commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine."

In the Medical Board's view, any violation of any state or federal law—no matter how mundane or innocuous—has been designated by the legislature as "unprofessional or dishonorable conduct likely to deceive or defraud the public." TEX. OCC. CODE § 164.053(a). In the Court's view, the Board's reading errs by "favoring microscopic examination of isolated words over consideration of the statute as a whole." *Ante* at ___. The dissent correctly points out that there is nothing wrong with "microscopic examination of isolated words" when those words are a legislatively supplied definition of a term. In the dissent's view, the Court's reasoning boils down to the assertion that "the statute simply cannot mean what it expressly says." *Infra* at ___. Yet our job is to apply statutes based on what they expressly say, not what we think they should say. *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 78 (Tex. 2017) ("[T]he foremost task of legal interpretation [is] divining what the law *is*, not what the interpreter *wishes* it to be.").

At the risk of engaging in "microscopic examination of isolated words," in my view a careful reading of section 164.053(a)(1) reveals that the Board has oversimplified the statute in a way that eliminates important words of limitation. Contrary to the Board's position, section 164.053(a)(1) is not triggered any time a physician "violates any state or federal law." It is only triggered when a physician "*commits an act that* violates any state or federal law." TEX. OCC. CODE § 164.053(a)(1) (emphasis added). Under the Board's approach, the statute would operate exactly the same way whether or not it contained the words "commits an act that." But we should disfavor any reading that renders these words superfluous. *Pedernal Energy, LLC v. Bruington Eng'g, Ltd.*, 536 S.W.3d 487, 491 (Tex. 2017); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("[E]ach word [is] chosen for a purpose . . . ."). In this case, giving

these words operative meaning poses no challenge. Their meaning is plain. By placing the words "commits an act that" in front of "violates any state or federal law," the legislature invoked the familiar distinction between acts and omissions. *Compare* TEX. PENAL CODE § 1.07(a)(1) ("'Act' means a bodily movement, whether voluntary or involuntary, and includes speech."), *with id.* § 1.07(a)(34) ("'Omission' means failure to act."); *see also id.* § 6.01(a) (conditioning the existence of an offense on a voluntary "act" or "omission"). Instead of predicating the Board's enforcement authority on the existence of *any* legal violation, the legislature made it dependent on the affirmative *commission of an act* that violates the law. If the legislature had wanted *any* violation of law to qualify as "unprofessional or dishonorable conduct likely to deceive or defraud the public," it could have dispensed with the words "commits an act that." TEX. OCC. CODE § 164.053(a)(1). Indeed, that is exactly what it did in section 164.053(a)(7), which is triggered any time a physician "violates Section 311.0025, Health and Safety Code."

We should apply the statute's words whether they make perfect sense to us or not. *Centerpoint Builders GP v. Trussway, Ltd.*, 496 S.W.3d 33, 36 (Tex. 2016) ("[W]e may not omit or gloss over verbiage in an attempt to reclaim clarity."). But in this context, the legislature's invocation of the act-omission distinction actually seems quite sensible. The ancient common-law origins of the act-omission distinction derive in part from the concept of the *actus reus*, under which crimes at common law required proof of an overt act as opposed to a failure to act. 4 WILLIAM BLACKSTONE, COMMENTARIES *21 ("[A] vicious will without a vicious act is no civil crime . . . . So that to constitute a crime against human laws, there must be, first, a vicious will; and, secondly, an unlawful act consequent upon such vicious will."). The act-omission distinction in criminal law, under which overt criminal acts traditionally were thought more blameworthy than

3

omissions, may not be as strong now as it was in Blackstone's time. But it retains force today, at least enough for the legislature to invoke it in section 163.054(a)(1). Punishing overt acts that violate the law is one thing. Punishing failures to act—particularly in a profession where countless complicated federal and state regulations impose an unfathomable array of legal duties—is quite another. The statute's distinction between illegal acts and illegal omissions does not draw a perfect line between deceptive legal violations and innocuous ones, as the majority attempts to do. But it does draw a line, and we should enforce it.

In my view, section 164.053(a)(1) does not encompass the Board's allegations against Dr. Aleman, which stem from his unlawful failures to act, not from unlawful actions. Section 193.005(h), the statute Dr. Aleman admittedly violated, states: "The person completing the medical certification shall submit the information and attest to its validity using an electronic process approved by the state registrar." TEX. HEALTH & SAFETY CODE § 193.005(h). According to the Medical Board, Dr. Aleman's conduct falls within section 164.053(a)(1) because he violated section 193.005(h) when he "admittedly *failed to sign* the [certificate of death] electronically." Resp't's Br. on the Merits 5 (emphasis added). The SOAH hearing officer stated in the Final Order that "Dr. Aleman violated Texas Health and Safety Code § 193.005(h) by *failing to certify* the death certificate for J.S. electronically." *Ruben Aleman, M.D.*, SOAH Docket No. 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.MD (Tex. Med. Bd. June 27, 2014) (emphasis added). The failure to sign is not an act. The failure to certify is not an act. They are omissions. The Board's complaint is that section 193.005(h) imposes an affirmative duty on Dr. Aleman, who *failed* to discharge it. Even as described by the Board and the hearing officer, Dr. Aleman's legal error was one of omission, not

4

of commission. Dr. Aleman admits he violated the statute, but that does not mean he "committed an act that violated" it.

The only act Dr. Aleman committed was signing the death certificate with a pen. But section 193.005(h) does not prohibit that act. Again, it states: "The person completing the medical certification shall submit the information and attest to its validity using an electronic process approved by the state registrar." It says nothing one way or another about the legality of hand-signing a certificate that has been "dropped to paper" and thereby removed from the state registrar's electronic system. The statute does not make it illegal to hand-sign and then *later* electronically certify, as Dr. Aleman attempted to do. The statute does not prohibit any action whatsoever with respect to a "dropped to paper" certificate. As far as section 193.005(h) is concerned, Dr. Aleman could have hand-signed it, thrown it in the trash, or made a paper airplane out of it. No matter what happened to the paper certificate, Dr. Aleman's only obligation under section 193.005(h) is to "submit the information and attest to its validity using an electronic process approved by the state registrar."

It might be argued that because hand-signing and electronically certifying are mutually exclusive methods, the act of hand-signing violates the duty to electronically certify. But the statute itself does not make the two options mutually exclusive. Only after consulting the jumbled innards of the "electronic process approved by the state registrar" could one know that, under the registrar-approved process, hand-signing and electronic certification happen to be mutually exclusive. But the "electronic process approved by the state registrar" is not "the law," so hand-

5

signing in violation of it does not trigger section 164.053(a)(1).[1] And even if the "electronic process" were the law, the act of hand-signing a certificate still would not violate the statutory duty to electronically certify. Under the state registrar-approved process, the option to hand-sign a paper certificate only arises after it has become impossible to electronically certify it. Once the certificate was "dropped to paper," hand-signing versus electronically signing was not an either/or proposition for Dr. Aleman. His options were to hand sign it or not hand sign it. Whether he took the overt act of signing the paper certificate or not, at that point he could not certify it electronically in compliance with section 193.005(h).

What made Dr. Aleman's violation of section 193.005(h) inevitable—and where the Board says he really went wrong—was his failure to register for the electronic certification system. Ultimately, the Board's objection to Dr. Aleman's conduct is not that he hand-signed the certificate *instead of* electronically certifying it. Once the certificate was "dropped to paper," he had no choice between the two methods.[2] In the end, the crux of the Board's objection is that the certificate had to be dropped to paper because Dr. Aleman was not registered with the electronic system. But the law contains no requirement that he register. And even if it did, by *failing* to

---

[1] We are directed to no formally promulgated regulation containing this "process." The Board describes the process based on witness testimony from state employees familiar with its inner workings, not based on citations to legal authority. If, as the Board seems to argue, the legislature outlawed whatever the state registrar-approved process would later happen to prohibit, then section 193.005(h) could fail a constitutional challenge under non-delegation principles. Article II, Section 1 of the Texas Constitution, our state's separation-of-powers clause, has been understood to prohibit the legislature from delegating to executive branch agencies the authority to make law. TEX. CONST. art. II, § 1; *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 941 (Tex. 1935) ("The power to pass laws rests with the Legislature, and that power cannot be delegated to some commission or other tribunal."); *Chancy v. State*, 19 S.W. 706, 709 (Tex. 1892) ("Laws can be made in this state only by the legislature, and it has no power to delegate to any board or other department of the government the power to annul laws enacted by it.").

[2] Although Dr. Aleman does not couch his statutory arguments in the text's distinction between acts and omissions, his statutory arguments implicate similar concerns by stressing the "impossibility" of complying with the statute after the certificate had been "dropped to paper." He essentially argues that he can't have *done* anything wrong because once the certificate was "dropped to paper" he did not have the option to *do* anything right. He is correct.

6

register he did not "*commit[] an act* that violates any state or federal law." TEX. OCC. CODE § 164.053(a)(1) (emphasis added).

The bottom line is that the Board is not prosecuting Dr. Aleman for what he did. It is prosecuting him for what he should have done. Under the Board's theory of this case, the legal violation to which Dr. Aleman admitted and for which he is being prosecuted is the *failure* to electronically certify a death certificate. Dr. Aleman may have violated the law by failing to certify electronically, but he did not thereby "commit[] an act that violates" the law. Under the text of section 164.053, his unlawful omission does not automatically qualify as "unprofessional or dishonorable conduct likely to deceive or defraud the public." The Board lacks authority to prosecute him for it. I concur in the Court's judgment vacating the sanctions against Dr. Aleman.

\* \* \*

> After having thus taken each individual one by one into its powerful hands, and having molded him as it pleases, the sovereign power extends its arms over the entire society; it covers the surface of society with a network of small, complicated, minute, and uniform rules, which the most original minds and the most vigorous souls cannot break through to go beyond the crowd; it does not break wills, but it softens them, bends them and directs them; it rarely forces action, but it constantly opposes your acting; it does not destroy, it prevents birth; it does not tyrannize, it hinders, it represses, it enervates, it extinguishes, it stupefies, and finally it reduces each nation to being nothing more than a flock of timid and industrious animals, of which the government is the shepherd.

ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA: HISTORICAL-CRITICAL EDITION 1252 (Eduardo Nolla ed., James T. Schleifer trans., Liberty Fund 2010).

Whether Tocqueville's darkly eloquent prophecy accurately describes modern America is in the eye of the beholder. Yet in at least one respect, his dystopic vision was undeniably prescient. More and more all the time, we live under a legal regime that "covers the surface of society with a network of small, complicated, minute, and uniform rules." *Id.* The total number of laws and

regulations is staggering. The Code of Federal Regulations is nearly 190,000 pages long, and it grows constantly. CLYDE WAYNE CREWS, JR., TEN THOUSAND COMMANDMENTS: AN ANNUAL SNAPSHOT OF THE FEDERAL REGULATORY STATE 14 (2018). Since 1993, federal agencies have issued more than 101,380 rules. *Id.* at 4. "And no one seems sure how many more hundreds of thousands (or maybe millions) of pages of less formal or 'sub-regulatory' policy manuals, directives, and the like might be found floating around these days." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.). Even as far back as 1982, the Justice Department tried to count the total number of federal criminal laws but concluded that doing so with precision was futile. Gary Fields & John R. Emshwiller, *Many Failed Efforts to Count Nation's Federal Criminal Laws*, WALL ST. J., (July 23, 2011), https://on.wsj.com/2oKFAiM. In Texas law, there are over 43,000 regulations in the Administrative Code and over 4,000 chapters of statutory code, each of which contain dozens or even hundreds of sections. We can only guess at the total number of duties the law imposes on us. Like the grains of sand in a jar, their number seems beyond our capacity to count.

According to the Medical Board, the Texas Legislature designated any violation of any of the countless state or federal statutory or regulatory legal obligations as "unprofessional or dishonorable conduct that is likely to deceive or defraud the public." TEX. OCC. CODE § 164.052(a)(5). If that is really the law, then perhaps reality is stranger than Tocqueville feared. Living under a network of complicated and minute rules may be our lot. Living under a regime that considers every violation of its complicated and minute rules to be morally blameworthy— deceptive, fraudulent, and dishonorable—would be quite another thing. But that is not out fate. We remain free citizens endowed with moral discernment apart from the dictates of the law. Free

people can tell the difference between laws that justly prohibit harmful conduct based on our shared sense of right and wrong and laws that outlaw otherwise innocuous behavior in pursuit of the government's innumerable regulatory goals. The notion that the Texas Legislature considers every minute violation of the myriad regulations under which doctors practice to be deceptive, fraudulent, and dishonorable conduct obviously strikes the majority of this Court as absurd. That is encouraging.

The ancient distinction between *malum in se* and *malum prohibitum* has deep roots in our legal tradition.[3] If we lose our sense of that distinction—between lawbreaking that is wrong in itself and lawbreaking that is wrong only because the government happens to have made it illegal—we are well on our way to becoming "nothing more than a flock of timid and industrious animals, of which the government is the shepherd."

_____

James D. Blacklock
Justice

**OPINION DELIVERED:** May 24, 2019

_____

[3] 1 WILLIAM BLACKSTONE, COMMENTARIES \*54–55, ("[D]ivine or natural *duties* . . . [do not] receive any stronger sanction from being also declared to be duties by the law of the land. The case is the same as to crimes and misdemeanors, that are forbidden by the superior laws, and therefore styled *mala in se*, such as murder, theft, and perjury; which contract no additional turpitude from being declared unlawful by the inferior legislature. For that legislature in all these cases acts only . . . in subordination to the great lawgiver, transcribing and publishing his precepts. So that, upon the whole, the declaratory part of the municipal law has no force or operation at all, with regard to actions that are naturally and intrinsically right or wrong. But, with regard to things in themselves indifferent, the case is entirely altered. These become either right or wrong, just or unjust, duties or misdemeanors, according as the municipal legislator sees proper . . . .").