DAVID WINTERMANN V. W. H. McDONALD, COMMISSIONER OF THE GENERAL LAND OFFICE.

No. 7063.   Decided February 10, 1937.
Rehearing overruled April 14, 1937.
(102 S. W., 2d Series, 167; 104 S. W., 2d Series, 4.)

*Rex G. Baker,* of Houston, *Powell, Wirtz, Rauhut & Gideon,* of Austin, for relator.

Under the provisions of the Act of 1900 (Ch. 11, Gen. Laws, p. 29) and the Act of 1931 (42nd Leg., p. 452) the land to which relator is seeking an award and patent is unsurveyed public free school land to which relator claims a preference right to purchase under the provisions of Section 5 of said act, and for that reason submits that the writ of mandamus should issue to him. Theisen v. Robison, 117 Texas 489, 8 S. W. (2d) 646; Reed v. Rogan, 94 Texas 177, 59 S. W. 255; Klein v. Humble Oil & Refining Co., 126 Texas 450, 86 S. W. (2d) 1077.

*William McCraw,* Attorney General, *H. Grady Chandler, Russell Rentfro,* Assistants Attorney General, for respondent.

All land sold under the provisions of Section 5, Ch. 271, of the Acts of the 42nd Legislature, Reg. Sess., are subject to the terms of the Relinquishment Act (Article 5367). Empire Gas & Fuel Co. v. State, 121 Texas 138, 47 S. W. (2d) 265; Stallcup v. Robison, 117 Texas 189, 300 S. W. 24; Magnolia Pet. Co. v. Walker, 125 Texas 430, 83 S. W. (2d) 929.

*Bramlette & Levy,* of Longview, filed argument as amicus curiae.

MR. JUSTICE SHARP delivered the opinion of the Court.

David Wintermann, relator, filed his petition for writ of mandamus to compel the Hon. J. H. Walker, Commissioner of the General Land Office, respondent, to award and patent to him 9.4 acres of land situated in Colorado County with a reservation to the State of only 1/16 of the minerals as a free royalty, provided that 1/8 of all sulphur and other mineral

substances from which sulphur may be derived or produced be reserved as a free royalty to the State. This right is claimed by virtue of the Act of 1931, Chapter 271 of the General Laws of the Regular Session of the 42d Legislature, which is commonly known as House Bill No. 358. (Article 5421c, Vernon's Annotated Texas Civil Statutes.)

Since this petition for mandamus was filed the Hon. J. H. Walker has been succeeded as Commissioner of the General Land Office by the Hon. W. H. McDonald, and motion has been duly made requesting that this Court enter its order substituting the Hon. W. H. McDonald, the present Commissioner of the General Land Office, as respondent in the place of the Hon. J. H. Walker, which request has been granted and the order entered by virtue of Article 2269, Vernon's Annotated Texas Civil Statutes.

Relator contends that on or about December 8, 1934, he discovered an unsurveyed area of school land which is not within five miles of a producing oil or gas well, and that he complied with all the requirements of the law, and is entitled to an award and patent therefor; that said land should be sold to him without condition of settlement and with a reservation of 1/16 of all minerals, except sulphur, as a free royalty to the State, and 1/8 of all sulphur and other mineral substances from which sulphur may be derived or produced, as a free royalty to the State.

Respondent contends that since January 19, 1934, he has issued many awards and patents to public school lands under the 1931 Act, and in all such awards and patents there has been placed therein a reservation of all minerals to the State. The respondent is willing to issue an award and patent to relator provided he will accept them with such reservation. Relator is unwilling to accept such an award and patent, and has requested the respondent to issue an award and patent only with the reservations and limitations above stated.

The land in controversy is a small tract, and has never been classified by the Land Commissioner. It is school land, by reason of its having been appropriated to the Public Free School Fund by the Act of 1900. Chap. 11 of the General Laws of the 26th Legislature, 1st Called Session, pp. 29 et seq., Vol. 11 of Gammel's Laws of Texas. It is not within five miles of a producing oil or gas well. It is undisputed that relator has the right of preference to purchase this land and that he has complied with all steps necessary to entitle him to acquire same under the provisions of the 1931 Act. Relator contends that the writ of mandamus should issue under the terms of this Act,

among others for the following reasons:

"The land involved here is unsurveyed land under the definition contained in Section 3 of the Act of 1931. Relator is given the preference right to purchase the land here involved under that portion of Section 5 of said Act, which reads as follows:

" 'Provided, that in all cases where a tract of school land has been occupied by mistake as a part of another tract, such occupant shall have a preference right for a period of six months after the discovery of the mistake, or after the passage of this act, to purchase the land at the same price paid or contracted to be paid for the land actually conveyed to him.' "

This action involves the construction of the Act of 1931. Since this Act is quite lengthy, we shall copy only the pertinent parts thereof applicable to the question before us, which are as follows:

"Section 1. All lands heretofore set apart to the public free school funds under the Constitution and laws of Texas, and all of the unappropriated and unsold public domain remaining in the State of whatever character, except river beds, and channels, and islands, lakes and bays, and other areas within tide water limits, are subject to control and sale under the provisions of this Act.

"Sec. 2. Surveyed public free school land may be sold by the Commissioner on the first day of any month to the person offering the highest price for it after the same has been advertised for sale in accordance with this Act and the provisions of subdivision 2 of Chapter 3, Title 86, Revised Civil Statutes, 1925, relating to school land, provided that all such land within five miles of a well producing oil or gas in commercial quantities shall be subject to lease only, and the surface rights shall not be sold.

"Sec. 3. Surveyed lands within the terms of this Act is defined to be all tracts or parts of tracts heretofore surveyed either on the ground or by protraction, and set apart for the public school funds and which is unsold, and for which field notes are on file in the General Land Office or which may be delineated on the maps of said office as such, and unsurveyed land is defined to be all areas not included in surveys on file in the General Land Office or surveys delineated on the maps thereof.

"Sec. 4. All land shall be sold without condition of settlement and with a reservation of one-sixteenth (1/16) of all minerals, as a free royalty to the State, which two conditions shall be expressed in the application to purchase and in the notice

of award, the minimum price to be fixed by the Commissioner and in no case to be less than one dollar ($1) an acre. Provided, that one eight[h] (1/8) of all sulphur and other mineral substances from which sulphur may be derived or produced shall be reserved as a free royalty to the State.

"Sec. 5. Any headright survey, homestead donation, preemption survey, scrip survey or other survey heretofore awarded or sold, which survey has been held and claimed in good faith by any party for a period of ten years prior to the date of application for patent and which surveys cannot be patented under existing laws, may be patented on payment of one dollar ($1) per acre to the Land Commissioner. In such cases the patent shall be issued to the owner now of record in the General Land Office and inure distributively to the true and lawful owners of the land, provided that in all cases where a tract of school land has been occupied by mistake as a part of another tract, such occupant shall have a preference right for a period of six months after the discovery of the mistake, or after the passage of this Act, to purchase the land at the same price paid or contracted to be paid for the land actually conveyed to him."

The sole question for decision is, whether the respondent should be required to issue an award and patent to relator for the land involved here, providing for a reservation to the State of only 1/16 of all minerals as a free royalty to the State, except that 1/8 of all sulphur and other mineral substances from which sulphur may be derived or produced shall be reserved as a free royalty to the State, or whether there should be inserted in the award and patent a reservation to the State of all minerals in, under, and on the land.

The burden is placed on the Legislature to sell the public free school lands "on such terms as may be prescribed by law." Article 7, Section 4, of the Constitution. In response to this command, many laws, including this Act, have been passed. The extent of the vast public domain of Texas placed a stupendous task upon the Legislature to safeguard the rights of all concerned by the enactment of proper laws. To accomplish this purpose the Legislature has from time to time enacted many land laws. We shall review only a part of them.

Chapter 3, Title 86, Article 5306 et seq., R. S. 1925, is generally known as the General Sales Law. This law furnishes certain fundamental rules for the sale of public lands. As early as 1883 the Legislature made provision to classify public lands and sell the agricultural land to settlers; and the minerals thereunder were "reserved by the State for the use of the fund

to which the land now belongs." See Act of April 12, 1883, 9 Gammel's Laws, 394; 31 Tex. Jur., p. 659.

In 1919 the Relinquishment Act was passed. Article 5367 reads:

"The State hereby constitutes the owner of the soil its agent for the purposes herein named, and in consideration therefor, relinquishes and vests in the owner of the soil an undivided fifteen-sixteenths of all oil and gas which has been undeveloped and the value of the same that may be upon and within the surveyed and unsurveyed public free school land and asylum lands and portions of such surveys sold with a mineral classification or mineral reservation, subject to the terms of this law. The remaining undivided portion of said oil and gas and its value is hereby reserved for the use of and benefit of the public school fund and the several asylum funds. (Acts 2nd C. S. 1919, p. 249; Acts 1st C. S. 1921, p. 112.)"

Article 5368 describes the terms upon which the owner may lease said land as the agent of the State.

1   By the provisions of the Relinquishment Act the State constitutes the owner of the soil its agent to sell or lease the oil and gas that may be thereon or therein, upon such terms and conditions as such owner may deem best, subject to the condition, among other things, that 1/16 of the gas and oil, in case of production, as a royalty shall be paid the State by the lessee. By its provisions the State is to receive as a minimum for the sale of the gas and oil 1/16 of all gas and oil as royalty, and ten cents per acre per annum as rental, and certain sums are to be received by the owner of the land for his services in making the lease as the agent of the State, during the term of the lease. This Act was construed to mean that the oil and gas in place shall not vest in the owner of the soil as his property, but that he shall receive certain interests in the minerals when a valid mineral lease has been executed by the owner of the surface estate as the agent of the State, in compliance with the terms of this Act. The Relinquishment Act has been construed by this Court in the following cases: Greene v. Robison, 117 Texas 516, 8 S. W. (2d) 655; Empire Gas & Fuel Co. v. State, 121 Texas 138, 47 S. W. (2d) 265, 274; Lemar v. Garner, 121 Texas 502, 50 S. W. (2d) 769, 773.

2   In 1925 the Legislature passed the Repurchase Act. (Chap. 94, and amended by the Acts of the 39th Leg. in 1926, 1st C. S., p. 43, Chap. 25, Art. 5326a, of Vernon's Annotated Texas Civil Statutes). Section 3 of the Act contains the following language:

"One-sixteenth of the oil and gas and all other minerals in the land included herein, whether known or unknown, are expressly reserved to the Public Free School Fund in the event the former sale was with mineral reservation." That Act was construed by this Court in the case of Magnolia Petroleum Co. v. Walker, 125 Texas 430, 83 S. W. (2d) 929, and it was held that the land had previously borne a mineral classification, and that when the land was repurchased under that Act it was repurchased under the same classification, and that all minerals were reserved to the State. It was also held in that case that the Act of 1925 should be construed in connection with other laws relating to this subject, including Article 5310 and the Relinquishment Act.

3  In 1931 the 42d Legislature enacted Senate Bill 310, Chapter 23, Article 5368a of Vernon's Annotated Texas Civil Statutes, which provided that title to 15/16 of all minerals in all lands described in said Act is vested in the owner of the soil, and 1/16 of the minerals as a free royalty was reserved to the State, in case of production, and the owner was authorized to develop said minerals, and might make such leases or sales of same as he might deem proper, subject only to the reservation of the State's 1/16 free royalty interest. The Act further authorized the owner of the land, on his behalf and as agent for the State, as to the royalty reserved by the State, to develop said minerals, or to sell or lease said land for oil and gas and other mineral development and production, and shall deliver to the State a 1/16 part of said oil or gas or other minerals free of cost. Because this Act violated several provisions of the Constitution, it was declared void in toto in the case of Empire Gas & Fuel Co. v. State, 121 Texas 138, 47 S. W. (2d) 265.

House Bill 358, the Act under consideration (now Article 5421c Vernon's Annotated Texas Civil Statutes), was enacted by the 42d Legislature in 1931, shortly after the enactment of Senate Bill 310. Both laws were passed by the same Legislature, and Senate Bill 310 was on the books, and had not been declared invalid, when House Bill 358 was passed. It clearly appears that House Bill 358 was enacted under the belief that Senate Bill 310 was a valid law. With Senate Bill 310 as a valid law, the owners of school land previously purchased would have the right to execute leases, for themselves and as the agents of the State, on the land for development of any mineral, which would include oil, gas, and sulphur.

4  The primary rule governing the construction of statutes is to ascertain from the language of the law the intention of the

Legislature. This Act specifically refers to other laws to be considered in connection with the administration of this law. In the construction of this Act, all laws relating to the minerals reserved to the State, and the general system of legislation of which it forms a part, should be considered. The object is to ascertain the consistent purpose of the Legislature in the enactment of laws, and to carry out the legislative intent, by giving effect to all laws bearing upon the same subject, although enacted at different sessions of the Legislature. 39 Tex. Jur., Sections 135, 136, and 137, pp. 253-260; 59 C. J., Sections 621 and 622, pp. 1051-1055.

5 Repeal of laws by implication is not favored. 39 Tex. Jur., Section 75, p. 140; 59 C. J., Section 510, p. 905. In the absence of an express repeal by statute, where there is no positive repugnance between the provisions of the old and new statutes, the old and new statutes will each be construed so as to give effect, if possible, to both statutes. 39 C. J., Section 75, p. 140. This rule is particularly applicable to the construction of statutes relating to our public school lands, and to the development of the minerals thereunder.

Let us analyze this Act in connection with other land laws, in order to ascertain the intention of the Legislature in enacting this law. Section 1 describes the land subject to the provisions of this Act, and expressly withdraws from sale "river beds, and channels, and islands, lakes and bays, and other areas within tide water limits." Section 2 provides that sales of surveyed public school lands shall be made in accordance with this Act and the provisions of Subdivision 2 of Chapter 3, Title 86, R. S. 1925, relating to school lands, but contains the following provision: "Provided that all such land within five miles of a well producing oil or gas in commercial quantities shall be subject to lease only, and the surface rights shall not be sold." Section 3 defines what is meant by surveyed and unsurveyed land. Section 4 describes the royalties reserved by the State. Section 6, among other things, also provides in what manner unsurveyed school land may be purchased, but specially excepts from sale land situated "within five miles of a producing oil or gas well." Thus it will be seen that both surveyed and unsurveyed school lands situated within five miles of a producing oil or gas well are not subject to sale, but are subject to lease only. Section 7 describes how the interest shall be paid. Section 8 describes the lands subject to lease. Section 9 provides how notice for bids shall be given. Section 10 describes the terms of the lease. Section 13 provides that "Articles 5323, 5338, and 5374 Revised Civil Statutes 1925, and all other laws

or parts of laws in conflict therewith, are hereby repealed."

**6** Section 5 of the Act is designed to enable those who have in good faith occupied unsurveyed or scrap tracts to acquire a good and perfect title thereto from the State, in preference to all others who may seek to purchase such land. The first part of Section 5 gives such opportunity to those who have held and claimed in good faith land located under headright surveys, homestead donations, and pre-emption or scrip surveys, but have defective title because such land could not under the law then existing be lawfully patented. The latter part of Section 5 contains the provision giving to the land owner the preference right to purchase the land involved. Furthermore, this preference right is permitted under Section 6 of the Act, even though some third party may have filed on the unsurveyed land and asked for a survey. It will be noted that this Act repeals certain articles of the statutes, and particularly Article 5323. Under the original Article 5323, many owners of farms and ranches who had bought and occupied their lands in good faith, but through mistake had purchased from other vendors unsurveyed areas of school land, believing them to be portions of other surveys, were harassed by persons purchasing these tracts, and this evil was sought to be remedied. Under the old law this land was subject to purchase by anyone desiring to purchase any portion of the unsurveyed land believed to belong to the School Fund, by making application therefor and complying with the terms stipulated in the subdivisions of Article 5323. The clear object of this part of this Act is to give the land owners the right to purchase this land and prevent outsiders from acquiring these unsurveyed vacant tracts within the boundaries or area of land already acquired.

**7** In 1931 the same Legislature which passed this Act made a special class of all lands formerly a part of the State of Oklahoma, and made provision for the sale of those lands without mineral reservation, thus removing them from the provisions of House Bill 358. (Senate Bill 481, Chap. 185, R. S. of the 42d Leg., p. 311.) In 1934 the Legislature passed an Act dedicating to the Permanent Free School Fund all escheated lands, and that Act provided that "all sales of escheated permanent free school lands shall be with a reservation to the State of all the minerals in the land in favor of the Permanent Free School Fund." Chap. 60, General and Special Laws 3d C. S. 43d Legislature. It follows that House Bill 358 would not control in determining the reservation of minerals as to such lands described in the two Acts above mentioned.

The Relinquishment Act (Article 5367 et seq.) deals only with oil and gas. Under the provisions of that law the land owner is only authorized to lease the land as the agent of the State for those minerals. It will be noted that one of the main objects of Senate Bill 310 was to give the land owner 15/16 of *all minerals,* reserving to the State only 1/16 of the minerals as a free royalty; and the land owner was authorized to act as the agent of the State in making leases for such minerals.

When House Bill 358 is considered in connection with Senate Bill 310, it shows that the land owner was authorized to execute leases as the agent of the State for all minerals, including sulphur. When Senate Bill 310 was removed, the Relinquishment Act was the only law in force expressly authorizing the land owner to execute a lease for oil and gas. No authority was given the land owner to execute a lease for sulphur and other minerals.

Until the enactment of Senate Bill 310 and House Bill 358, Article 5388 et seq. furnished the authority for the development of sulphur belonging to the State. With Senate Bill 310 removed, the owner of the sold land could lease it only for gas and oil, as provided for under the Relinquishment Act. The other minerals, except coal and lignite, are subject to sale or development under Article 5388 et seq. Unsold unsurveyed lands are subject to lease by the Commissioner under Article 5353 et seq. and certain provisions of this Act.

8 House Bill 358 and the Relinquishment Act should be construed together. It is plain that the 1931 Act is not intended to repeal the Relinquishment Act; nor does the Relinquishment Act occupy the field covered by this law. This law covers a wider field than the Relinquishment Act. The land sold under the provisions of this Act will be governed by the terms thereof, and not by the terms of the Relinquishment Act.

9 While this Act does not specifically provide that the land owner shall be authorized to execute a mineral lease as an agent of the State, as provided for under the Relinquishment Act, and as was provided for under Senate Bill 310, yet we think that this Act, when construed in the light of the policy of this State relating to public lands and minerals as expressed in certain laws, if not directly, impliedly authorizes the land owner to act as the agent of the State in executing mineral leases thereon, and reserving to the State the free royalties described in Section 4 thereof. If this Act were not given this construction, all sulphur and other minerals, except oil and gas, would be controlled and subject to lease by the Commissioner of the

General Land Office under Article 5353 et seq., Revised Civil Statutes, and the provisions of this Act. These articles of the statutes do not provide for the land owner to receive any part of the minerals. We do not think that it was the purpose of the Legislature to deprive those who acquire land under this Act of all mineral rights thereunder.

We think that the Legislature intended that the purchasers of land subject to sale under this Act shall acquire such land and the minerals therein, but that there shall be reserved to the State 1/16 of all minerals as a free royalty to the State, except as to sulphur and other mineral substances from which sulphur may be derived or produced, and as to these a 1/8 thereof shall be reserved as a free royalty to the State.

10   The royalties reserved by the State under the provisions of this law constitute a fee in the minerals in place, and will follow the land. For a very able and exhaustive discussion of this question we refer to the opinion of Justice GREENWOOD in the case of Sheffield v. Hogg, 124 Texas 290, 77 S. W. (2d) 1021, 80 S. W. (2d) 741. The term "free royalty" introduced into this Act must mean that the interest reserved to the State in the minerals produced on school land sold under the terms of the Act must not bear any part of the expense of the production, sale, or delivery thereof. The owner of the land acts as the agent of the State in making the mineral leases. This calls for the exercise of a duty by the land owner to the State. The land owner owes to the State good faith in the performance of a duty which he has assumed, and he should discharge that duty with prudence and good faith, and with ordinary care and diligence.

Relator's application for writ of mandamus will be granted, and the Land Commissioner will issue an award and patent to relator for the land involved here, reserving to the State 1/16 of all minerals as a free royalty to the State, except as to sulphur and other mineral substances from which sulphur may be derived or produced, and as to these reserving a 1/8 thereof as a free royalty to the State.

Opinion delivered February 10, 1937.

### ON MOTION FOR REHEARING.

The following language was used in the original opinion in this case:

"That both surveyed and unsurveyed school lands situated within five miles of a producing oil or gas well are not subject

to sale but are subject to lease only."

In order that there may be no confusion in applying the rule announced in the opinion, we here state that part of Section 5 of H. B. No. 358 is not involved in this case. That part reads:

"Any headright survey, homestead donation, pre-emption survey, scrip survey or other survey heretofore awarded or sold, which survey has been held and claimed in good faith by any party for a period of ten years prior to the date of application for patent and which surveys can not be patented under existing laws, may be patented on payment of one dollar ($1) an acre to the Land Commissioner."

Therefore, it is not necessary to hold that land described in that part of said section can not be acquired by purchase if it is situated within five miles of a producing oil or gas well. That question is not before us, and we express no opinion thereon.

With these statements, the motion for rehearing is overruled.

Opinion delivered April 14, 1937.