**G. Bradley BOURLAND, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12303.**

Court of Civil Appeals of Texas, Austin.

Oct. 8, 1975.

Rehearing Denied Oct. 29, 1975.

Mitchell, George & Belt, Arthur Mitchell and ·Jan Woodward Fox, Austin, for appellant.

John L. Hill, Atty. Gen. of Tex., William O. Goodman, Asst. Atty. Gen., Austin, for appellee.

SHANNON, Justice.

This appeal involves Tex.Bus. & Comm. Code Ann. art. 17.41, *et seq.,* and its predecessor, Tex.Rev.Civ.Stat.Ann. art. 5069–10.–01, *et seq.* Article 17.41, *et seq.,* is commonly known as the Deceptive Trade Practices-Consumer Protection Act. Article 17.46(a) of that Act declares unlawful any false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.

Appellee, the State of Texas, filed suit in the district court of Travis County against appellant, G. Bradley Bourland, individually, and as president of Kurbo, Inc., and as an officer of Hacienda de Oro Products, Inc., Falcon Advertising and Sales, Inc., and Falcon Financial Corporation, and other defendants[1] seeking to enjoin them from committing certain alleged deceptive acts, for penalties, and for restitution of money for the benefit of certain persons who had paid money pursuant to alleged deceptive trade practices. Upon final hearing, the court entered a judgment which provided, among other things, that Taylor, Levy, and Bourland pay $50,026.40 into the registry of the court ". . . as restitution of monies acquired by . . . [those persons] . . . pursuant to deceptive trade practices . . . ." It is from that portion of the judgment that Bourland has taken an appeal to this Court. We will affirm the judgment.

In its petition, the State pleaded that the defendants Taylor, Levy, and Bourland were engaged in the promotion, development and construction of a purported resort and retirement community located on Lake Falcon in the state of Tamaulipas, Republic of Mexico. That development was allegedly marketed by those persons as "Lake Falcon Country Club," "Lake Falcon Country Club Estates," and "Club Campestre de Lago Falcon." Appellee alleged further that those persons promoted the development through a combination of various cor-

porate and partnership entities, some of which were: Falcon Financial Corporation, Inc., Falcon Advertising and Sales, Inc., Hacienda de Oro Products, Inc., and Kurbo, Inc., Compania Constructora de Falcon, S. A., and Country Club Membership Sales.

The State pleaded further that the false representations and fraudulent conduct made the basis for the suit arose from a common scheme or conspiracy originally between Taylor, Levy and others. Allegedly those persons would solicit and receive large sums of cash from unsophisticated investors under the guise of developing the resort-retirement complex, but instead those sums were to be converted to their own use. The State alleged that Bourland by his conduct subsequently became an active participant in the said scheme, that he furthered its purpose and enjoyed a portion of the proceeds gathered in by the realization of the scheme, and for all purposes should be treated as a co-conspirator.

The State alleged that by August, 1972, Taylor, Levy, and Bourland began promoting and advertising the Lake Falcon project to residents of Texas and Florida. Lots and homesites were sold and memberships in the limited partnership known as "Country Club Membership Sales" were solicited from the general public. A membership could be purchased for $6,000.00 and it would entitle one to the use of a lot in the development; to two shares of stock in Compania Constructora de Falcon, S. A.; to the use of the country club and marina currently under construction or soon to be constructed; and to employment opportunities in the planned community at the resort development. The State pleaded that in the course of promoting the development, soliciting memberships in the country club, and in selling homesites, condominiums, and townhouses, Taylor, Levy, and Bourland engaged in the following acts and made the

1. Falcon Advertising and Sales, Inc.; Hacienda de Oro Products, Inc.; Falcon Financial Corporation; Kurbo, Inc.; James Richard Taylor, individually and as president of Falcon Advertising and Sales, Inc.; and Dennis Robert Levy, individually and as an officer of Hacienda de Oro Products, Inc., and Kurbo, Inc.

following misrepresentations in violation of Tex.Rev.Civ.Stat.Ann. art. 5069–10.02 and Tex.Bus. & Comm.Code Ann. art. 17.46(a):

(1) Representing that Taylor had invested substantial amounts of his own capital in the project.

(2) Representing that Taylor exercised legal control over acreage located on the southern shores of Lake Falcon in northern Mexico that would be used as the site of the proposed development.

(3) Representing that the $6,000 membership investment made by the investors in the Country Club Membership Sales would be held in trust by G. Bradley Bourland, trustee.

(4) Representing that the Banco Nacional de Mexico, S. A. guaranteed the legal title in trust for investors in the limited partnership or alternatively guaranteed the usufruct right to these investors in the said 36,000 acres or that a portion of the said acreage was to be purchased with partnership funds.

(5) Representing that the Banco Nacional de Mexico safeguards incoming funds, payment of taxes, and essential services as further security to the limited partners and members of the development.

(6) Representing that the trust agreement with the Banco Nacional de Mexico guaranteed title or the usufruct right to the land continued in perpetuity and was freely assignable and inheritable by the heirs of the member or investors.

(7) Representing that the following facilities had been or were being constructed at the site of the Lake Falcon Country Club or Club Campestre Lago Falcon:

Country clubs, motels, condominiums, homes, shopping centers, churches, marinas, mobile home parks, Two Worlds Recreation Amusement Park, hospital, hunting preserves, cultural village, health spa, camping facilities, golf courses, townhouse apartments, supermarkets, tennis clubs, riding stables, bull ring, private airport, convention hall, Jai-Lai Fronton, fishing piers, international restaurants, theatre clubs, athletic stadium, recreational parks, international culture trade mart, service station, farmers market, and location sets for motion picture companies.

(8) Representing that a $6,000.00 membership in the limited partnership known as Country Club Membership Sales would entitle the investor to the use of a lot or a mobile home site in the development.

(9) Representing that the development was to be built on a constant level lake and that lake front lots would be made available to investors.

(10) Representing that an investor in Country Club Membership Sales would be guaranteed a job at the development at a salary of at least $20,000.00 each year.

(11) Representing that the two shares of stock in Compania Constructora de Falcon, S. A. which were transferred to each investor in the Country Club Membership Sales had a present value of $3,000.00.

(12) Representing that townhouses or condominiums would be constructed at a certain pre-development price which was $3,000.00 below the real value.

Appellant Bourland was the only defendant who filed an answer. By way of defense, appellant averred that he was an attorney and that in the autumn of 1971 Taylor employed him to draw the necessary instruments creating legal entities through which the development of the Lake Falcon project could be accomplished. Pursuant to that employment he set up Falcon Advertising and Sales, Inc., Hacienda de Oro Products, Inc., and Falcon Financial Corporation.

Bourland denied knowledge or notice of any scheme or conspiracy on the part of the other defendants to defraud anyone. He pleaded further that the other defendants had duped him and that he had lost considerable time, effort, and money in discharging his duty as an attorney. He claimed that in disbursing funds he acted as

an attorney and as an employee following the directions and instructions of his clients. He denied misrepresenting or causing to be done any act to procure those funds. He denied further that he appropriated any of those funds, and he denied having ". . . any agreement to participate in the spoils of this scheme and gigantic fraud conceived and executed by the other defendants herein."

Bourland answered further that, "While it is admitted that some of the acts which have been voluntarily disclosed to the Plaintiff [the State] on the part of G. Bradley Bourland appear to cast him in light as principal, his sole role here was as attorney, as employee, and as agent; he sought only to discharge his duty as a conscientious attorney and not to play a principal role in any plan, scheme, or contrivance to defraud the public."

Upon final hearing the court entered judgment adverse to the defendants. That judgment recited that ". . . the facts are what the Plaintiff [appellee] has alleged in its petition and that the Defendants have engaged in certain acts and practices in violation of Article 5069–10.02, V.T.C.S., The Texas Deceptive Trade Practices Act and Section 17.46 of the Texas Business & Commerce Code, the Texas Deceptive Trade Practices-Consumer Protection Act . ." As already stated, the judgment provided that Taylor, Levy, and Bourland pay into the registry of the court $50,026.40 as restitution of monies acquired by them "pursuant to deceptive trade practices."

Appellant attacks the judgment by a number of points of error. Appellant claims by points of error three and four that the court erred in entering judgment against him since there was no evidence, or insufficient evidence, that ". . . Appellant was a [*sic*] active participant in a *conspiracy to defraud* individuals identified in Plaintiff's Original Petition." (Emphasis added)

Appellant's points three and four misapprehend the case pleaded by the State and the judgment entered by the district court. The State pleaded and the effect of the judgment of the district court was that Taylor, Levy, and Bourland had entered into a conspiracy to obtain property by engaging in false, misleading, or deceptive acts and practices in violation of Art. 17.41, *et seq.* of the Tex.Bus. & Comm.Code. Contrary to appellant's assertions, the State did not undertake the rather onerous burden of proving a conspiracy to commit actionable fraud.

It may be said, in general, that an actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *State v. Standard Oil Co.,* 130 Tex. 313, 107 S.W.2d 550, 559 (1937), *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567 (Tex.1963). The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy. *Dale v. Temple,* 186 Tenn. 69, 208 S.W.2d 344 (1948), *Brumley v. Chattanooga Speedway and Motordrome Co.,* 138 Tenn. 534, 198 S.W. 775 (1917). It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction. Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions on the part of the conspirators. *International Bankers Life Ins. Co. v. Holloway, supra.* Upon entering the conspiracy one becomes a party to all acts previously or subsequently done by any of the other conspirators in pursuance of the conspiracy. *State v. Standard Oil Co., supra.*

We have found no cases in point involving a conspiracy to engage in false, misleading, or deceptive acts. However, applying the above general rules, it would seem that to show a conspiracy to engage in false, misleading, or deceptive acts or prac-

tices in violation of Art. 17.41 of the Tex. Bus. & Comm.Code requires proof of an agreement to obtain property from others by engaging in a course of conduct which the parties know has a tendency or capacity to deceive.

■ With respect to the proof necessary to establish a civil conspiracy it is not necessary that the conspiracy be shown by direct evidence. *International Bankers Life Ins. Co. v. Holloway, supra.* The case may be established by circumstantial evidence. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1968).

■ We will treat points of error three and four as raising the issue of whether there was any evidence raising a fact issue as to appellant's status as a conspirator in a conspiracy to violate Art. 17.41, *et seq.* of the Tex.Bus. & Comm.Code and whether the judgment of the district court, in so holding, was contrary to the great weight and preponderance of the evidence. As phrased by the State, the question for resolution by this Court is whether the evidence supports a reasonable inference that appellant had actual knowledge that the practices of Taylor and Levy had a capacity to deceive, and that those practices were done for the purpose of acquiring property or money of others, and that appellant intended to participate therein and to share in the gains so derived.

The statement of facts consists of 1,066 pages and the parties introduced about one hundred fifty-three exhibits. The details of Taylor's plan for development of the Lake Falcon project are unclear, and one concludes that the project was never a sufficient reality to make it necessary to consider details. The record is, however, replete with description of the transactions by which Taylor and Levy obtained the money supposedly to be used for the capitalization of the project. The following paragraphs represent our effort to summarize the transactions culminating in this suit.

Appellant Bourland testified that he had been licensed to practice law since 1950. He formerly served as Securities Commissioner of the State of Texas and as an assistant attorney general of the State of Texas. He attempted to concentrate most of his professional attention to a practice concerning securities and corporate affairs.

Bourland testified that Taylor came to him in the autumn of 1971 seeking legal assistance in connection with the proposed development on Lake Falcon. Taylor represented to Bourland that he owned, or at least had some character of possessory rights to, some 30,000 acres of land in Mexico on the south side of Lake Falcon for which he had paid about $3,000,000. Taylor told Bourland that he owned other property in Mexico and in this country and indicated to Bourland that he was a man of wealth and substance. Bourland never saw the acreage on Lake Falcon, but Taylor showed him some character of legal document written in Spanish which he said was a deed. Bourland does not read Spanish and he never had anyone translate that document for him.

After several conferences it was agreed between Taylor and Bourland that Bourland would receive, as a fee for his legal services, a ten percent proprietary interest in all of the legal entities which he set up. He was also to be reimbursed for expenses.

Before Bourland had undertaken any legal work on the project, and as early as October 1971, Taylor, his wife, and Levy began importuning Bourland frequently for sums of money as large as $1,000.00 and as small as $100.00. Bourland testified that he advanced to them about $27,894.04 of his personal funds with the understanding that the money would be repaid by the development project or by Taylor. It was Bourland's impression that Taylor needed the advances to live on, and by this point in time he realized that Taylor ". . . did not have the cash to do these things with."

By the summer of 1972, Taylor had indicated to Bourland that he needed money

before he could start the development since Taylor said that he did not want to sell his assets or the land in Mexico to raise the necessary cash.

By the summer of 1972, Bourland had drafted the legal instruments necessary for the creation for Falcon Advertising and Sales, Inc., and Kurbo, Inc. Neither of the corporations were capitalized at the time of their creation, and at trial time neither had any substantial assets. Both corporations were designed as marketing vehicles for development properties. More specifically both corporations were to be general partners in limited partnerships which would handle the sales of memberships in Texas. Bourland was elected secretary of Falcon Advertising and Sales, Inc., and he was authorized to write all of the checks for the corporation and to receive the deposits from the potential investors.

Taylor caused to be prepared a brochure extolling the advantages of the Lake Falcon Country Club Development in which brochure that development was billed as ". . . a NEW garden spot in the world . . . ." The "master plan" of the development, as stated by the brochure, showed a variety of improvements so ample that there seemed to be something for everyone. These improvements included motels, condominiums, homes, shopping centers, churches, marinas, mobile home parks, the "Two World" recreation amusement park, hunting preserves, a cultural village, a hospital, a health spa, golf courses, townhouse apartments, tennis clubs, riding stables, a bull ring, a private airport, a racetrack, and international restaurants. The brochure also described how persons could obtain an interest in the development.

One page in the brochure listed "Lake Falcon Country Club Attorneys and Corporation Officers. Under that heading appeared the following:

"UNITED STATES:

Bradley Bourland, Attorney at Law
1701 West Avenue—Austin, Texas
Phone: 477–6788

"Bachelor of Business Administration, 1943; Bachelor of Law, 1949, University of Texas, was President of the University of Texas Student Body. Assistant Attorney General, 1950 to 1954. Securities Commissioner 1954–1956. Vice Chairman of the National Association of Securities Administrators. President of the Austin Texas Exes Club and councilman of the University of Texas Ex-students Association for the Austin area. He is also very active in Masonic activities, Past master of University Lodge No. 1190, Past Commander of Commandery, York Rite Mason, Scottish Rite Mason and Shriner. He has been in private practice since 1956 primarily in business, real estate corporate, and security fields."

Bourland testified that he did not give Taylor permission to list his name as an attorney. When Taylor showed the brochure to him, Bourland remonstrated with Taylor, particularly for having included the description of his Masonic activities. Bourland's testimony was, however, that he did not forbid Taylor to use the brochure. Though Taylor did not tell Bourland that he was going to use the brochure in connection with the sale of memberships, Bourland assumed that he would. The record shows that Bourland's assumption was correct.

Taylor and Levy canvassed Texas for investors with only fair success. The main territory which they worked was Florida. In Florida their tale of their project on the shores of Lake Falcon must have been successful because by the latter part of 1972, Bourland began receiving many checks from Florida investors. Between July, 1972, and November, 1973, the Falcon Advertising and Sales, Inc., account received about $209,470.21. Bourland deposited these checks in the Falcon Advertising and Sales, Inc., account. In some instances the deposit slips show "less cash" items in varying amounts. The total amount of the "less cash" items was $22,332.00. The evidence showed that of the total amount of $187,-138.21 deposited in fact to the account,

Bourland disbursed $50,855 to Taylor, $15,450 to Taylor's wife, $23,401.53 to Levy, and $44,026.40 to himself.

By the fall of 1972 Bourland knew that Taylor and Levy had no intention of conducting the business in an orthodox manner. No ledger books were kept, no accounting was done, and no receipts were furnished.

Because Bourland held the purse strings, he knew to whom the investors' money went. An examination of the checks which Bourland signed shows that he knew that Taylor, who but only months before had been practically dependent upon him for bread, was now living in the manner of a grandee complete with Cadillac automobiles and expensive apartments. For the same reason Bourland must have realized that little, if any, of the investors' money was being used. to further the building of the project.

In the spring of 1973 Bourland went to Florida at Taylor's request. He took with him a large colored poster showing a splendid master plan of the development. There Bourland met with a number of investors in the project. Taylor introduced him to several of these investors as "the trustee of accounts" or as "the man that has your money in trust in Texas." Bourland knew that these statements were, at best, misleading and he must have realized that those statements would be relied upon as some investors stated such in his presence. At the time of the meeting in Florida, Bourland knew that of the $43,000.00 of contributions deposited since January 1, 1973, a little less than $1,000.00 remained on deposit.

About a month after Bourland's visit to Florida some of the investors came to Austin and inquired of Bourland about Taylor, the whereabouts of their money, and his thoughts about the project. Bourland replied that Taylor was in good financial shape, that the money was in trust in Mexico, and that "everything was fine" with the project and that it was a "good thing."

Other investors fearing, in time, that perhaps talk of the lips tendeth only to penury [2] made further inquiry into the title of the land in Mexico and the status of the project. Their concern was justified. The record shows that Taylor owned no acreage in Mexico on Lake Falcon and, of course, neither he nor his corporations had placed any improvements on such land. In that connection, the most that Taylor had obtained was some class of option to buy several thousand acres within the boundaries of the proposed development. That option, however, had expired in October, 1971, long before Taylor had begun his active promotions.

In the autumn of 1973 Taylor left this country for the Republic of Mexico. In October of 1973 shortly before the State filed suit, appellant disbursed $20,000 from the Falcon Advertising and Sales, Inc. account to Levy who took that money to Mexico.

From an examination of the record, some of which has been summarized, we are of the opinion that it may reasonably be inferred from the evidence that Bourland acquired knowledge at some time during the two-year period involved that the acts and practices of Taylor and Levy had the capacity to deceive and that such were done for the purpose of acquiring property or money from others, and that Bourland intended to participate therein and to share in the gains. We are further of the opinion that the judgment entered by the district court is not so contrary to the great weight and preponderance of the evidence so as to be manifestly unjust.

Appellant's points of error one and two are that the court erred in entering judgment against him because there was no evidence, or insufficient evidence, that

2. Proverbs 14:23
"In all labour there is profit: but the talk of the lips tendeth only to penury."

" . . . Appellant *personally* made any of the misrepresentations or engaged in any of the deceptive acts or practices alleged . . ." by the State. (Emphasis added) Because of our view, already expressed, that Bourland was a member of the conspiracy, points of error one and two are not dispositive of the appeal.

By an appropriate point of error appellant says that the district court erred in entering judgment for restitution of money under Tex.Bus. & Comm.Code art. 17.41, *et seq.* for the reason that the statute does not extend protection to the class of person to whom appellant is ordered to make restitution. Appellant supports this point of error by reference to arts. 17.44 and 17.45 of the Tex.Bus. & Comm.Code. Art. 17.44 provides, among other things, that the subchapter shall be liberally construed to protect "consumers" against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty. Art. 17.45 defines "consumer" to mean "an individual who seeks or acquires by purchase or lease, any goods or services." "Goods" are defined in art. 17.45 to mean "tangible chattels bought for use," and "services" are defined in art. 17.45 to mean "work, labor, and services for other than commercial or business use, including services furnished in connection with the sale or repair of goods." The "investors" in the Lake Falcon project, says appellant, are outside the scope of the statute since they are not "consumers" inasmuch as they did not seek or acquire "goods" or "services" as therein defined.

Appellant overlooks art. 17.47(d) which empowers the court to " . . . make such additional orders or judgments as are necessary to compensate identifiable *persons* for actual damages or restoration of money or property, real or personal, which may have been acquired by means of any act or practice restrained." (Emphasis added) The word, "person," is defined by art. 17.45(3) as an " . . . individual, partnership, corporation, association, or other group, however organized." It may be that appellant has confused the State's right to seek restitution on behalf of identifiable persons with a citizen's right to file suit under arts. 17.50 and 17.51. In that category of suit the class of claimants is restricted to "consumers" within the meaning of art. 17.45(4).

We have considered all of appellant's contentions and find them without merit, and accordingly, the judgment is affirmed.