Roy E. KIMSEY, Jr., et al., Appellants,

v.

Anna M. FORE et al., Appellees.

No. 8347.

Court of Civil Appeals of Texas,
Beaumont.

Dec. 6, 1979.

Rehearing Denied Jan. 10, 1980.

Robert E. Morse, Jr., Houston, for appellants.

Lawrence A. Mann, Laredo, Max Luther, III, Marshall Boykin, III, Robert J. Patterson, Corpus Christi, Jack Pew, Jr., Dallas, for appellees.

KEITH, Justice.

Plaintiffs below appeal from a take nothing judgment entered after the trial court granted defendants' motions for judgment non obstante veredicto. The principal question presented is what obligation, if any, is owed by the holder of the executive right to the owners of nonparticipating mineral interests.[1]

---

1. Dean Ernest E. Smith has written: "[N]either commentators nor courts are in agreement on the standard of conduct that should be required of the holder of the executive right." Annual Survey of Texas Law, Oil and Gas, *30 Sw.L.J.* *107, 109 (1976).* The supporting authorities cited by Dean Smith are these: *R. Heminway, The Law of Oil and Gas, § 2.2 (1971),* and *2 H. Williams & C. Meyers, Oil and Gas Law § 339.2 (1975),* and the cases cited therein.

## 1. Factual Recitation

Suit was brought by plaintiffs as the owners of nonparticipating term royalty against several sets of parties:

(1) The McCampbell grantor-lessors, the owners of ⅘ths of the mineral interest who had sold one-half of the royalty from an 854-acre ranch in Zapata County to plaintiffs' predecessors in title. The royalty was conveyed by four of the five owners of the royalty under the land by deed dated February 17, 1969, which provided that the grant would continue for a period of five years from the date of the instrument and as long thereafter as oil and gas was produced from the lands.

(2) Lessee Hoover and his geologist-associate Butts, the lessees of the McCampbell group who also own fractional working and overriding royalty interests in the property.

(3) Operator Miami Oil Procedures, Inc. (hereinafter "Miami") and non-operators Kipp and Zapata Investment Co., Inc. (hereinafter "Zapata"), Trustees, the assignee lessee and joint owners of a working interest.

(4) Joint lessor Schendel, the lessor of the other one-fifth mineral interest who joined in the lease to Hoover and Butts which formed the basis of this suit.

Plaintiffs alleged and the proof showed that at the time plaintiffs' predecessor in title acquired the royalty conveyance, a well was being drilled on the McCampbell Ranch and that it produced from two sands for a limited time but mechanical difficulties caused its abandonment. This well was being drilled by Jake L. Hamon under a lease which expired May 23, 1971.

Shortly thereafter, Robert Mather, a former partner of the defendant-geologist Butts, wrote a letter to the defendant Schendel seeking a lease on the 854-acre tract but was told that the McCampbell family was not interested in leasing until the outstanding royalties had terminated. Mather testified that defendant Anna Fore made a similar statement to him. Mather had offered the McCampbells the same terms as he made in securing a lease at about the same time upon the 1280-acre adjoining Lopez tract.

In April 1972, Butts made a second offer to lease the McCampbell acreage, this time offering an increased bonus of $15 per acre, but such offer was rejected. On April 25, 1972, Hoover and Butts met in Schendel's office with Schendel and his two elderly aunts, Anna Fore and Mildred McCampbell, and the parties discussed the terms of a new lease.

This offer was also rejected by the McCampbell group although the primary term was reduced from five to two years, the delay rentals increased from $2 per acre to $25, and the shut-in royalty was increased.

According to Butts, the terms of the proposed lease were rejected because "the McCampbells wanted to be given a one-eighth royalty, regardless of when a well was drilled on—on that tract." This rejection occurred in April, 1972, and plaintiffs' term royalty did not expire until February 17, 1974.

Hoover and Butts eventually obtained, in multiple counterparts, a lease dated May 23, 1972, which was identical with the earlier rejected lease except for three changes:

(a) The primary term was extended from two years to three years;

(b) The delay rental was reduced from $25 per acre per year to $2 per acre per year; and

(c) "Lessors will receive no less than a full one-eighth of production." (See discussion of "paragraph 12" on footnote 3, infra.)

As Hoover said: "[W]e promised that if production were established before the term royalty expired, that we would pay what was owing the term royalty owners."

The lessee defendants eventually obtained leases on almost 8,000 acres surrounding the McCambell Ranch and the adjoining Lopez tract. As defendant Butts testified, these two leases "control[led] the prospect." Miami began drilling wells on the acreage, the Lopez No. 1 being completed on July 23, 1973, as a producer; however, it was not

until January 6, 1974, that it began drilling on the McCampbell tract. This well was not completed until May 3, 1974—after the expiration of plaintiffs' term royalty. The well was a producer from two sands and Geologist Otell, on behalf of plaintiffs, testified that the value of a ten percent interest in the gas was in excess of one million dollars. Other production was secured subsequently from a second well on the McCampbell tract.

Otell testified that Miami's early drilling operations, away from the McCambell tract, did not conform to those of a reasonably prudent operator. The prudent operator would have drilled first where he knew that there was a productive sand—as confirmed by the Hamon producer on the McCampbell property.

We also note in passing that Miami rejected a farmout of the McCampbell tract in late 1973, and that Hoover instructed Miami regarding the McCampbell acreage:

"DO NOT DRILL UNTIL MARCH, 1974 (Outstanding Royalty Expires 2/74)"

### 2. Jury Findings

We divide the several defendants into different groups and summarize, as briefly as possible, the jury findings, and non-findings, as to each group.

1. *The McCampbell Group* (except Anna Fore and Mildred McCampbell)

a. *As a whole*:

# 1 & 2—Failed to find that the lessors failed to "use utmost fair dealing" with regard to plaintiffs' royalty interests in refusing to execute the leases to

Mather in 1971 and Hoover in April 1972.[2]

# 3—Failed to find that they failed to use utmost fair dealing by insisting on the full ⅛th royalty as a prerequisite to executing a lease on the ranch.

# 4—Failed to find they failed to use utmost fair dealing by refusing in April, 1972, to lease for a 2-year primary term with $25 per acre per year delay rental rather than allowing a 3-year primary term with $2 per acre per year delay rental "so as to facilitate delay in completion of a producing well on the 854 acres."

# 5—Found that they failed to use utmost fair dealing as to plaintiffs' royalty interests by the inclusion in the lease of "paragraph 12" which "shifted the burden of Plaintiffs' royalty interest to the Lessee and his assignees."[3]

# 6—Found they failed to use utmost good faith by giving the benefit of any reversion of plaintiffs' royalty interests to the lessee.

# 7 & 8—Failed to find that they failed to use utmost good faith in not including in the lease a primary term which would end before, or some other requirement which would reasonably enable production to be obtained before plaintiffs' royalty interests expired; or in failing to exercise any efforts to require the lessee-operator to drill earlier.

# 9—Failed to find that the acts and omissions found in answer to some of the first eight issues were a proximate cause of the expiration of plaintiffs' royalty interests.

2. The instruction was in this language: " 'UTMOST FAIR DEALING' means the same degree of diligence and discretion on the part of the owners of the leasing rights as would be expected of the average land owner who because of self-interest is normally willing to take affirmative steps to cooperate with a prospective lessee."

3. Paragraph 12 of the lease reads:
"It is a specific agreement between Lessor and Lessee that Lessor shall be paid royalty equal in amount to the royalty set out in this lease to cover the royalty owned by Lessor on the date of this lease just as if on the date of this lease each Lessor owned the full royalty rights appurtenant to each Lessor's mineral and leasing rights ownership. All other royalty covered by this lease and not owned on the date of this lease by Lessor shall be borne by and paid by Lessee as a royalty burden over and above and in addition to the royalty which Lessee is hereby agreeing to pay Lessor. If, during the life of this lease, any royalty not owned by Lessor on the date of this lease should revert to Lessor, Lessee's obligation to pay Lessor royalty equal in amount to that set out in this lease shall not be increased."

# 10—Found plaintiffs' damage to be $42,752—the precise sum paid to the entire group, excluding Schendel who had not sold any interest to plaintiffs.

b. *As to Anna Fore and Mildred McCampbell*:

# 1—(Same finding as for the McCampbell Group as a whole as to Mather lease in 1971)

# 2—Found they failed to use utmost fair dealing as to the Hoover lease of April, 1972.

# 3—(Same finding as for the McCampbell Group as a whole)

# 4—Found that they failed to use utmost fair dealing by refusing in April, 1972, to lease for a 2-year primary term with $25 per acre per year delay rental rather than allowing a 3-year primary term with $2 per acre per year delay rental "so as to facilitate delay in completion of a producing well on the 854 acres."

# 5, 6, 7, & 8—(Same findings as for the McCampbell Group as a whole)

# 9—Found that the acts and omissions found in answer to some of the first eight issues were a proximate cause of the expiration of plaintiffs' royalty interests.

# 10—(Same finding as for the McCampbell Group as a whole)

2. *As to Defendant Butts*:

# 11—He induced a breach of the contractual relationship by participating in the negotiation of the May 23, 1972, lease.[4]

# 12—Which act was a proximate cause of the expiration of plaintiffs' interests.

# 13—His recommendation to Miami to drill on adjacent properties before drilling on the McCampbell tract "was influenced" by the expiration date of plaintiffs' royalty interests.

# 14—Such recommendation was a proximate cause of the expiration of plaintiffs' royalty interests.

# 15, 16, & 17—He delayed recommending to Miami the drilling of the first well on the McCampbell tract "beyond the time that a reasonably prudent geologist" would have "except for the existence . . . of Plaintiffs' term royalty interests"; that such delay was a proximate cause of the expiration of the royalty interest; and, found the amount of plaintiffs' damage to be $100,000.

3. *As to Defendant Hoover*:

# 18, 19, 20, & 21—These were issues that were identical to those submitted as to Butts and the jury returned identical answers, including the amount of damage.

4. *As to Defendant Miami*:

# 22—That it delayed the drilling of the first well on the McCampbell tract beyond the time a reasonably prudent operator would have delayed because of the existence of plaintiffs' royalty interests.

# 23—Which was a proximate cause of the expiration of plaintiffs' royalty interests.

# 24—That it knowingly delayed drilling on the tract for the purpose of allowing plaintiffs' royalty interests to expire.

# 25—Which was a proximate cause of the expiration of plaintiffs' royalty interests.

# 26—It knowingly delayed completion and production on the tract for the purpose of allowing plaintiffs' royalty interests to expire.

# 27—Which was a proximate cause of the expiration of plaintiffs' royalty interests.

# 28—It breached its implied covenant of reasonable development which it owed to plaintiffs.

# 29—Which was a proximate cause of the expiration of plaintiffs' royalty interests.

---

**4.** The jury was instructed in this issue that "the duty to use utmost fair dealing and diligence in the exercise of the exclusive-leasing privilege arises out of a contractual relationship with the plaintiffs under implied covenants in the non-participating term royalty deeds."

\# 30—To plaintiffs' damage in the sum of $100,000.

### 3. The Conspiracy Issues

For reasons set out hereinafter, we do not reach the several issues relating to conspiracy and pretermit any discussion of such issues at this point.

As noted earlier, the trial court denied plaintiffs' motion for judgment against any defendant and granted the several motions of the defendant for judgment non obstante veredicto, and plaintiffs have appealed.

### OPINION

Several cases from our Supreme Court have now fixed firmly the rules governing appellate review of judgments non obstante veredicto. We quote from *Dodd v. Texas Farm Products Company*, 576 S.W.2d 812, 814–815 (Tex.1979):

> "To sustain the action of the trial court in granting the motion for judgment notwithstanding the verdict, it must be determined that there is no evidence upon which the jury could have made the findings . . . In acting on the motion, all evidence must be considered in a light most favorable to support the jury verdict, and 'every reasonable intendment deducible from the evidence' is to be indulged in favor of the verdict. *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 777 (Tex. 1974); *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547 (1962). Only the evidence and inferences therefrom that support the jury finding should be considered, with all contrary evidence and inferences being rejected. *Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194 (1952). A judgment notwithstanding the verdict can only be upheld when rendition of a directed verdict would have been proper. Rule 301, Texas Rules of Civil Procedure."

See also, *Campbell v. Northwestern National Life Ins. Co.*, 573 S.W.2d 496, 497 (Tex. 1978); *Lucas v. Hartford Accident & Indemnity Co.*, 552 S.W.2d 796, 797 (Tex.1977).

The guidelines are clear; and, the lengthy record must be examined in accordance with the rules so laid down for our guidance.

It is apparent from a study of the cases on the subject that the instruction relating to "utmost fair dealing" (footnote 2, supra) was extracted from dictum found in *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543, 545 (1937).[5] The duty imposed upon the owners of the executive rights by the charge also finds support in several other cases. See, e. g., *Morriss v. First National Bank of Mission*, 249 S.W.2d 269, 276 (Tex. Civ.App.—San Antonio 1952, writ ref'd n. r. e.) (Pope, J.):

> "[T]he owner of the executive rights owes the royalty owners utmost good faith, *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543, *Wintermann v. McDonald*, 129 Tex. 275, 102 S.W.2d 167, 173, 104 S.W.2d 4 . . . ."

The "utmost fair dealing" test was approved by Lee Jones, Jr., the author of the article "Non-Participating Royalty", *26 Texas L.Rev. 569, 572 (1948)*, where he terms the quoted language to be "highly significant."

Similarly, *Schlittler* is cited with approval in *H. Williams & C. Meyers, 2 Oil & Gas Law § 339.2, at 206–207 (1977)*, along with many other authorities. The question we face was raised and decided in the recent case of *Portwood v. Buckalew*, 521 S.W.2d 904, 911 (Tex.Civ.App.—Tyler 1975, writ ref'd n. r. e.), where the foregoing and many other authorities are cited in support of the holding.

■ We are satisfied that the test of utmost fair dealing is an implied covenant arising from the royalty deed which is imposed upon the owners of the executive right to lease. *Portwood v. Buckalew*, supra, and authorities therein and herein cited.

Counsel for the McCampbell defendants suggests that since the Supreme Court in

---

**5.** "We think that self-interest on the part of the grantee may be trusted to protect the grantor as to the amount of royalty reserved. Of course, there should be the utmost fair dealing on the part of the grantee in this regard."

*Andretta v. West,* 415 S.W.2d 638, 641 (Tex. 1967), declined an opportunity "to define the precise standard of conduct required of the holder of the executive right," it is impermissible for us to rely on earlier cases from our supreme court where the language used was not necessary to the decision. It is also suggested that the "standard established in *Wintermann v. McDonald*[6] [129 Tex. 275, 102 S.W.2d 167, 173, 104 S.W.2d 4 (1937)] as preferable to that announced by dictum in *Schlittler v. Smith.*"

Counsel, admitting that the *Portwood* judgment "was obviously correct," criticizes the court's reliance upon the Jones' theory (*26 Texas L.Rev. 572,* supra), and the dictum in *Schlittler v. Smith,* supra. We do not concur in this criticism of the holding in *Portwood.*

It is also contended that "such nebulous and uncertain covenants as 'duty to use utmost fair dealing' " should not be implied. In support of this contention, we are cited to language found in *Freeport Sulphur Co. v. American Sulphur Royalty Co.,* 117 Tex. 439, 6 S.W.2d 1039, 1041–1042 (1928), and *Danciger Oil & Refining Co. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635, 137 A.L.R. 408 (1941). We disavow any intention of making a contract for the parties. Instead, we are of the opinion that such an implied covenant is required in such a case as is now under review. Indeed, Justice Pierson in *Freeport,* supra, used language which is applicable here, saying that it is necessary to imply such covenant "in order to give effect to and effectuate the purpose of the contract as a whole." (6 S.W.2d 1041–1042) This record is a concrete illustration of the absolute necessity of such an implied covenant. The jury found that the holders of the executive rights, aided and abetted by the other defendants, effectively caused the loss of plaintiffs' rights under the royalty deed.

Implied covenants of reasonable development and protection against drainage have long been well recognized in the case of oil, gas and mineral leases. *W. T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27, 29 (1929); *Grubb v. McAfee,* 109 Tex. 527, 212 S.W. 464, 465 (1919).

We disagree with the defendants' conclusion that *Freeport Sulphur* and *Danciger Oil* preclude the imposition of an implied covenant upon the owner of the executive right. Nor are we impressed with the contention that the ultimate issues of fact against the McCampbell lessors were breach of the implied covenant to reasonably develop or to protect from drainage. The ultimate issue went to the jury—did Anna Fore and Mildred McCampbell breach their implied covenant by failing to use utmost good faith in protection of plaintiffs' rights. If the test used—utmost good faith—was correct, the issue submitted the proper question. As indicated earlier, we approve such submission.[7]

Other defendants approach the solution to the duty question somewhat differently but we do not extend this already too lengthy opinion to spell out their theories. It is sufficient to state that we have reviewed the briefs and the authorities cited and find their contentions to be without merit.

■ After our review of the record made in this four-week trial, under the standards laid down in *Dodd v. Texas Farm Products Co.,* supra (576 S.W.2d at 814–815), and the other authorities cited, we are of the opinion that there was *some* evidence to support

6. This is the language used in *Wintermann v. McDonald*:

"The owner of the land acts as the agent of the State in making the mineral leases. This calls for the exercise of a duty by the landowner to the State. The landowner owes to the State good faith in the performance of a duty which he has assumed, and he should discharge that duty with prudence and good faith, and with ordinary care and diligence."

7. Alternatively, this group of defendants contend that the manner of submission of Issues 2 and 4 and 5 and 6 "clearly contain comments on the weight of the evidence." In passing upon no evidence points arising after the granting of a motion for judgment non obstante veredicto, we decline to consider the question of the wording of the special issue which was set aside.

the jury's answers to the several issues which would have imposed liability upon the defendants. Consequently, we find that it was error for the trial court to have granted the motion for judgment non obstante veredicto and to have refused to enter judgment upon the verdict which was returned.

We decline to overturn the trial court's ruling on the conspiracy issue, No. 32, and the succeeding issues in that series. We quote No. 32 in the margin,[8] noting that the thrust of the inquiry is whether Hoover and Butts entered into a conspiracy "which they knew had a tendency or capacity" to injure plaintiffs. Other issues inquired if Miami and Miles joined.

■ Plaintiffs, relying upon *Bourland v. State*, 528 S.W.2d 350, 354–355 (Tex.Civ. App.—Austin 1975, writ ref'd n. r. e.), assert that the issue correctly submitted the ultimate issue in a conspiracy case. We disagree. *Bourland* arose under the provisions of the Deceptive Trade Practices— Consumer Protection Act, *Tex.Bus. & Comm.Code Ann. § 17.41, et seq. (Supp. 1978–79)*. Moreover, it was a suit brought by the Attorney General on behalf of the State of Texas seeking an injunction to restrain certain alleged deceptive trade practices and for restitution of money for the benefit of victims of such practices.

Although the Austin Court did discuss the leading authorities from Texas on the law of conspiracy, because of the particular statute governing such advertisements (*Sec. 17.41, et seq.*), it upheld an injunction from engaging in conduct which the parties knew had "a tendency or capacity to deceive." (528 S.W.2d at 355)

We decline to permit the introduction of such a theory into the law governing a conspiracy at common law such as those fact situations exemplified by the authorities discussed by Justice Shannon in *Bourland.* See Lynn, "Anatomy of a Deceptive Trade Practices Case", *31 Sw.L.J. 867, 872 (1977).*

We are of the opinion that the issues submitted by the court on conspiracy did not submit ultimate issues and that the trial court properly disregarded such findings when entering judgment. We find no merit in plaintiffs' points 5, 7, 8, 9, and 10 insofar as such points complain of action based upon the conspiracy findings. Each is, to the extent noted, overruled.

Miami and Hoover and Butts have brought forward crosspoints wherein each contends that the jury findings upon which liability is fixed are so against the great weight and preponderance of the evidence as to be manifestly unjust.[9] We must consider these crosspoints under a different standard than that which controls our review of the "no evidence" points arising under the grant of the motion for judgment non obstante veredicto. We are required to consider all of the evidence in passing upon such points. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

Having made such a review of the evidence in the record, we overrule all of the crosspoints by the several defendants challenging the *factual* sufficiency of the jury findings which we have found to impose liability upon the defendants as shown hereinafter.

■ Miami has one additional crosspoint which we must mention—a complaint that Special Issue No. 30[10] did "not incorporate

8. SPECIAL ISSUE NO. 32. "Do you find from the preponderance of the evidence that some time during the period between April 26, 1972 and May 23, 1972 Defendants Lawrence E. Hoover and J. D. Butts entered into a conspiracy to obtain an Oil and Gas Lease which they knew had a tendency or capacity to deprive Plaintiff of one-half of the royalty under four-fifths of the mineral interests under the 854 acre tract in Survey 274 in Zapata and Jim Hogg Counties, Texas, covered thereby?"

9. We do not reach Schendel's crosspoint relating to conspiracy and contribution.

10. SPECIAL ISSUE NO. 30. "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiffs for the loss of the non-participating term royalty interest which they would have had if it had not been caused to be terminated?"

the correct measure of damages, the fair market value of the royalty interest in Zapata County." We note that the objections to the charge by Miami are to be found in a supplemental statement of facts filed long after the expiration of time within which such objections should have been before this Court.

Moreover, such objections cover more than twelve pages in such statement of facts and only the single complaint is now urged. Such practice is not looked upon with favor. See *Monsanto Company v. Milam*, 494 S.W.2d 534 (Tex.1973); *Hemmenway v. Skibo*, 498 S.W.2d 9, 11 (Tex.Civ. App.—Beaumont 1973, writ ref'd n. r. e.).

There was no evidence controverting that given by plaintiffs' witness concerning the value of the royalty interest. While the jury was not required to accept Otell's testimony that the royalty interest was worth millions of dollars, it is readily apparent that it was not overly generous with the defendants' funds. We do not find reversible error under the circumstances presented by this record. Miami's multifarious crosspoint No. 13 is overruled.

We now proceed to the entry of the judgment which the trial court should have entered. Based upon the foregoing opinion and our review of the record, we enter the following order:

1. The judgment of the trial court as to the defendants Schendel, Kipp, Zapata Investment Co., Inc., and all of the McCampbell group, except Anna Fore and Mildred C. McCampbell, is affirmed.

2. The judgment denying plaintiffs a recovery against the defendants Fore, Mildred C. McCampbell, Hoover, Butts, and Miami is now reversed and judgment rendered that the plaintiffs do have and recover from said named defendants, jointly and severally, the sum of $42,752, together with interest at the rate of nine percent per annum from and after December 13, 1978.

3. The judgment denying plaintiffs a recovery against the defendants Hoover, Butts, and Miami, having been reversed, it is now ordered that the plaintiffs do have

and recover from said named defendants, jointly and severally, the additional sum of $57,248, together with interest thereon at the rate of nine percent per annum from and after December 13, 1978, until paid.

4. Costs of appeal are divided between the parties Fore and Mildred McCampbell, one-third; Hoover, Butts, and Miami, one-third; and plaintiffs, one-third.

5. All relief sought and not herein granted is denied.

Affirmed in part, and in part Reversed and Judgment Rendered. It is so ordered.